1
2
3
4                     UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6                          SAN JOSE DIVISION

7

8    JAMES GOODELL, et al.,                    Case No.  19-cv-06196-VKD

              Plaintiffs,
9
                                               **ORDER GRANTING IN PART AND**
10        v.                                   **DENYING IN PART PLAINTIFFS'**
                                               **MOTION TO EXCLUDE TESTIMONY**
11   SOLEDAD UNIFIED SCHOOL                     **OF DEFENSE EXPERT DR. LAURA**
     DISTRICT, et al.,                          **SCHREIBMAN**
12
              Defendants.                       Re: Dkt. No. 98
13

14        Plaintiffs James Goodell, Heather Goodell and their minor child, C.G.,[1] sue for alleged

15   civil rights violations and disability discrimination.  The Amended Complaint, which is the

16   operative pleading, asserts claims under 42 U.S.C. § 1983, the Americans with Disabilities Act of

17   1990, 42 U.S.C. § 12101, *et seq*., and the Rehabilitation Act of 1973, 29 U.S.C. § 794, as well as

18   several state law claims for relief.  Dkt. No. 40.  C.G. has autism spectrum disorder ("ASD").

19   Plaintiffs' claims arise from abuse of C.G., allegedly perpetrated by defendant Jaime Notheis, who

20   was one of C.G.'s teachers.  The Soledad Unified School District ("District") and Jaime Calderon,

21   a principal employed by the District, are also defendants.[2]

22        Plaintiffs now move to exclude the testimony of defense expert Dr. Laura Schreibman.

23   The District opposes the motion.[3]  Upon consideration of the moving and responding papers, as

24   _____

25   [1] Mr. Goodell is also C.G.'s guardian ad litem.  Dkt. No. 10.

26   [2] In this order, the District and Mr. Calderon are referred to collectively as the "District."

27   [3] During a hearing on a prior discovery dispute, the Court was told that Mr. Notheis, who is
     represented by separate counsel, "joined" in the District's expert disclosures.  Dkt. No. 79.
28   Although the ECF docket indicates that Mr. Notheis received notice of plaintiffs' present motion,
     he has not filed any response, and the time for doing so has passed.  Counsel for Mr. Notheis

United States District Court
Northern District of California

well as the arguments presented at the June 15, 2021 hearing, the Court grants plaintiffs' motion in part and denies it in part.[4]

## I.    BACKGROUND

Dr. Schreibman is one of three experts disclosed by the District to rebut the opinions of plaintiffs' expert, Dr. Helena Huckabee, regarding the nature and scope of the impact (if any) the alleged abuse has had on C.G.  Dr. Schreibman is a psychologist who specializes in the field of autism.  *See* Dkt. No. 98-3 at ECF 33-79.  The other two experts are Dr. Richard J. Shaw, a child psychiatrist, and Dr. Pamela Mills, an education specialist.  In discovery, the District produced a Rule 26(a)(2) report ("Schreibman report"), ostensibly authored by Dr. Schreibman and jointly signed by Drs. Schreibman, Shaw and Mills, to rebut Dr. Huckabee's opinions and conclusions.  Although Dr. Huckabee's report is not before the Court, she apparently will testify that the alleged abuse had a significant impact on C.G.  She opines that some of his behavioral and functional issues are due to post-traumatic stress disorder ("PTSD") resulting from the alleged abuse, and that C.G. consequently requires certain psychotherapy and other services.

The Schreibman report disputes Dr. Huckabee's diagnosis of PTSD, as well as her conclusions attributing C.G.'s issues to that condition, and questions the need for Dr. Huckabee's recommended therapy and services.  The Schreibman report reflects opinions to the effect that C.G.'s behavioral and other issues are not due to PTSD, and are entirely consistent with a diagnosis of ASD.  As such, the report concludes that C.G.'s educational and other services that are already in place should be sufficient to support and treat a child with ASD, with no need for any increased services or treatment due to PTSD or the alleged abuse.

The Schreibman report bears Dr. Schreibman's letterhead and states that the report was "prepared in collaboration with" Drs. Shaw and Mills.  Dkt. No. 98-2 at ECF 1.  Beneath Dr. Schreibman's signature appears the following statement:

---

appeared at the June 15, 2021 motion hearing, but did not present any oral argument.

[4] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 19, 26, 32.

United States District Court
Northern District of California

> As noted previously, this report was prepared in collaboration with Richard J. Shaw, M.D. and Pamela Mills, Ed. D., Ph.D. In signing below, each affirms that they have reviewed and analyzed the same facts, data, and material relating to this case, as referenced above, and have reached the same conclusions and opinions expressed in this report. Accordingly, both are prepared to testify as to the conclusions and opinions stated in this report, as well as bases for those conclusions and opinions.

*Id*. at ECF 32. The signatures of Drs. Shaw and Mills appear under this statement. *Id*.

In discovery, plaintiffs previously moved to strike the proposed testimony of Drs. Schreibman, Shaw and Mills. Plaintiffs argued that the proposed testimony was cumulative because the Schreibman report suggested that all three experts would offer the same opinions based on review and analysis of the same materials. Chief among plaintiffs' stated concerns, however, was that the Schreibman report was deficient because it failed to describe each expert's proposed testimony and the bases and reasons for them as required by Rule 26(a)(2). Noting that Drs. Schreibman, Shaw and Mills each have different backgrounds and expertise, the District asserted that it did not intend to present cumulative testimony, but rather than produce a separate report for each expert, the District suggested that plaintiffs could take depositions to ascertain each expert's specific testimony, the bases for their respective opinions, and the extent to which each expert collaborated with, and relied upon the opinions of, the other two. *See* Dkt. No. 77 at 11; Dkt. No. 79. Notwithstanding that it chose to produce a single report for all three experts, the District planned to have all three experts testify at trial. However, if only one of the experts were to testify, the District said it would be Dr. Schreibman. Dkt. No. 79.

The Court agreed that the testimony as presented in the Schreibman report was cumulative and that the report did not meet the disclosure requirements of Rule 26(a)(2). The District was limited to calling Dr. Schreibman to testify at trial, subject to the Court's ruling on any pretrial motions challenging her qualifications or testimony. Dkt. No. 80. Additionally, the District was ordered to serve an amended report that made "clear the nature and extent of Dr. Schreibman's reliance, if any, on information or opinion provided by another expert." *Id*. To permit time for the amended report and related discovery, the Court extended the March 25, 2021 expert discovery cutoff to April 30, 2021 for depositions relating to the expert testimony disclosures of Drs.

Huckabee and Schreibman. *Id.*[5] That deadline was further extended, pursuant to the parties'

stipulation, to May 30, 2021. Dkt. No. 95.

On March 30, 2021, the District served another version of the Schreibman report, which

now bears only Dr. Schreibman's signature and also contains an "Addendum," in which Dr.

Schreibman describes the nature and purpose of her collaboration with Drs. Shaw and Mills:

> For the preparation of this rebuttal report, I consulted with Richard
> J. Shaw, M.D., a child psychiatrist, and Pamela Mills, Ed.D., Ph.D.
> an educational specialist. Given the nature of the issues and
> recommendations brought up in the Huckabee report, I felt it
> prudent to ensure that my opinions and conclusions would be
> confirmed by relevant experts in certain areas. These individuals
> also provided input relating to the clarity and organization of my
> written report.
>
> Specifically, I particularly sought Dr. Shaw's opinions regarding
> psychiatric consultation as recommended by Dr. Huckabee. I am
> not a child psychiatrist and wanted to ensure my opinions
> represented best and accepted practices for psychiatric consultation
> including the nature of the evaluation, symptoms requiring
> additional evaluation, and the typical schedule of evaluations for
> children with ASD. Dr. Shaw provided helpful input here. I also
> consulted Dr. Shaw regarding incidence of aggression in children
> with ASD to make sure my opinions were consistent with his. Dr.
> Shaw provided me with a research article by Kanne and Mazurek
> which I reviewed and found consistent with my knowledge in the
> area. Dr. Shaw provided me with the UCLA PTSD Reaction Index
> forms for children and adolescents, which I reviewed. These forms
> were consistent with my knowledge and opinions. Dr. Shaw also
> confirmed my opinions regarding PTSD and its relation to ASD.
>
> I consulted with Dr. Mills regarding services provided by school
> districts and how these related to the recommendations of Dr.
> Huckabee. Dr. Mills also provided input regarding intellectual and
> behavioral assessments and her input was consistent with my
> opinions.

Dkt. No. 98-3 at ECF 32. In sum, Dr. Schreibman says that she "consulted with Dr. Shaw and Dr.

Mills to see if their views corroborated [her] opinions relating to relevant psychiatric (Shaw) and

educational (Mills) issues," but that she "did not otherwise rely in any way on Dr. Shaw's or Dr.

Mills' input in formulating [her] conclusions or opinions" and that "[t]heir input confirmed and

provided detail to strengthen and support [her] own conclusions and opinions." *Id.*

---

[5] The Court previously granted two stipulated requests to continue the expert discovery cutoff, which originally was set for October 23, 2020. *See* Dkt. Nos. 36, 48, 68.

Based on information obtained in Dr. Schreibman's May 11, 2021 deposition, plaintiffs now move to exclude Dr. Schreibman's testimony. Plaintiffs contend that the Schreibman report still fails to comply with the disclosure requirements of Rule 26(a)(2), and that Dr. Schreibman is not qualified under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) to offer any opinions regarding PTSD. Plaintiffs point out that in deposition, Dr. Schreibman testified that she also consulted with a third individual, Dr. Bryna Siegel, Ph.D.—a fact not disclosed in the Schreibman report. Additionally, Dr. Schreibman acknowledged that she has not knowingly encountered, diagnosed, or treated an autistic child with PTSD. The District maintains that there is no basis to exclude Dr. Schreibman's proposed testimony. For the reasons discussed below, the Court grants plaintiffs' motion in part and denies it in part.

## II.    DISCUSSION

### A.    Fed. R. Civ. P. 26(a)(2)

A written expert report must contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i), (ii). Parties must also timely supplement a Rule 26(a) disclosure "if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing," or "as ordered by the court." Fed. R. Civ. P. 26(e). A party that "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1107 (9th Cir. 2001).

Plaintiffs argue that Dr. Schreibman's "Addendum" fails to clarify the nature or extent of her reliance on Drs. Shaw or Mills as previously ordered by this Court. The particular focus of their motion, however, is Dr. Schreibman's undisputed failure to disclose that she also consulted with Dr. Siegel in preparing her report. In deposition, Dr. Schreibman described Dr. Siegel as "a very well-known autism expert and developmental psychologist," with expertise in

"developmental assessment and evaluation." Dkt. 98-4 (Schreibman Depo. 9:2-7). Although plaintiffs contend that the failure to disclose Dr. Schreibman's consultation with Dr. Siegel is tantamount to the failure to disclose a new expert, there is no evidence that any defendant has retained or paid Dr. Siegel as an expert in this litigation. *See* Dkt. No. 100-1 ¶ 7. The fact that the District may have engaged Dr. Siegel as a consultant in other matters is immaterial.

At the same time, however, the record suggests that Dr. Schreibman's consultation with Dr. Siegel may have been more extensive than the District claims. The District notes that Dr. Siegel never received a copy of Dr. Schreibman's report, and that Dr. Schreibman's consultation with Dr. Siegel amounted to little more than a single 10-minute phone call. Dkt. No. 98-4 (Schreibman Depo. 9:8-15). In deposition, Dr. Schreibman testified that she did not discuss autism or PTSD with Dr. Siegel, but did discuss some of Dr. Huckabee's assessments pertaining primarily to adaptive behavior and intellectual functioning, to "make sure that [Dr. Schreibman's] conclusions and [her] opinion regarding Dr. Huckabee's conclusions were consistent with best practice and what's known in the field." *Id.* (Schreibman Depo. 9:16-12:15). Courts have permitted experts to confer with others as a "sounding board or reference point" in making their own assessments. *See Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 546 (C.D. Cal. 2012); *see also Wolkowitz v. Lerner*, No. SA CV 07-777-CAS, 2008 WL 1885770, at *4 (C.D. Cal. Apr. 21, 2008) ("To the extent that defendants are arguing that Reiss improperly conferred with an unidentified, outside consultant, the cited deposition testimony shows only that Reiss asked the consultant questions to confirm Reiss' own opinions."). However, plaintiffs note that while Dr. Schreibman testified in deposition that she had only one ten-minute phone call with Dr. Siegel, and that Dr. Siegel never joined in any phone calls with Drs. Shaw or Mills (*see* Dkt. No. 98-4 (Schreibman Depo. 17:25-18:2), Dr. Shaw's billing records identify a one-hour phone call he had with both Drs. Siegel and Schreibman (Dkt. No. 102-3). The District suggested at oral argument that Dr. Schreibman's own participation in that call may have been limited to no more than 10 minutes.

The bottom line is that Dr. Schreibman's consultation with Dr. Siegel should have been disclosed inasmuch as Dr. Schreibman's own deposition testimony demonstrates that she

consulted with Dr. Siegel and at least considered Dr. Siegel's input to some degree in preparing her report. The District offered no reasonable explanation for the failure to disclose the consultation with Dr. Siegel, particularly where the record indicates that defense counsel was aware that Dr. Schreibman would be contacting Dr. Siegel to seek her input. *See* Dkt. No. 98-5. Plaintiffs maintain that the extent of Dr. Siegel's involvement remains unclear. They declined the Court's suggestion of possible additional discovery to clarify the record, citing the fact that trial is scheduled to commence in a few weeks and their ability to adequately prepare for trial has already been prejudiced by the District's failure to disclose.

On the record presented, Dr. Schreibman's consultation with Dr. Siegel does not appear to be so wide-ranging as to justify the exclusion of Dr. Schreibman's testimony on a wholesale basis. Accordingly, plaintiffs' request to preclude Dr. Schreibman from testifying at all based on her failure to comply with the disclosure requirements of Rule 26(a)(2) is denied. However, the Court will exclude those portions of Dr. Schreibman's proposed testimony that relate to her consultation with Dr. Siegel, as the District should have disclosed the information Dr. Schreibman obtained from Dr. Siegel pursuant to Rule 26(a)(2)(B)(ii) and this Court's March 23, 2021 discovery order. When questioned in her deposition, Dr. Schreibman stated that she consulted with Dr. Siegel about certain assessments Dr. Huckabee had conducted of C.G. Dkt. No. 98-4 (Schreibman Depo. at 9:18-10:23; 12:6-15). These assessments included the Brigance assessment, the Peabody Picture Vocabulary test, the Expressive One-Word Vocabulary test, and the Vineland Social Maturity Scale. *Id.* (Schreibman Depo. at 10:7-15). Dr. Schreibman may not testify regarding her opinions concerning these specific assessments or any other assessments about which she consulted with Dr. Siegel.

**B.      Fed. R. Evid. 702**

Rule 702 of the Federal Rules of Evidence provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if all of the following requirements are satisfied:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 703 further identifies the permissible bases of an expert's opinion testimony, including "facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Additionally, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, [the facts or data] need not be admissible for the opinion to be admitted." *Id*. "But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id*.

Expert testimony is admissible under Rule 702 if it is both relevant and reliable. *See Daubert*, 509 U.S. at 597. The determination of whether expert testimony is admissible is a matter within the Court's discretion, *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 142 (1999); *Gen'l Elec. Co. v. Joiner*, 522 U.S. 136, 141-43 (1997), and "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue," *Daubert*, 509 U.S. at 592-93. This "basic gatekeeping obligation" applies to all expert testimony, not just scientific testimony. *Kumho*, 526 U.S. at 147. Additionally, the Court's inquiry is a flexible one, and "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id*. at 153. The proponent of expert testimony has the burden of proving admissibility. *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

While plaintiffs do not dispute that Dr. Schreibman is an expert regarding autism, they contend that she is not qualified to offer any opinions regarding PTSD because she admittedly has never diagnosed PTSD and thus cannot reliably offer "reasoning or methodology [that] is scientifically valid" or properly apply her analysis to the facts at issue. *Daubert*, 509 U.S. at 580.

8

Indeed, although Dr. Schreibman agrees that PTSD exists and can be diagnosed in autistic children, she testified that she has never in her career diagnosed PTSD or authored any articles or studies concerning the diagnosis of PTSD in autistic patients, explaining, "Well, I'm not an expert in PTSD in terms of, you know, historically with my training, and I just don't believe I have seen it." Dkt. No. 98-4 (Schreibman Depo. 12:21-13:18, 23:17-24).

The District counters that Dr. Schreibman is "aware" of PTSD and has "general familiarity" with that condition. Dkt. No. 100 at 8; Dkt. No. 113. As such, the District contends that Dr. Schreibman appropriately may opine about PTSD based on her consultation with Dr. Shaw, who does have experience with the diagnosis and treatment of that condition. "[A]n expert can appropriately rely on the opinions of others if other evidence supports [her] opinion and the record demonstrates that the expert conducted an independent evaluation of that evidence." *Cholakyan*, 281 F.R.D. at 544. However, an expert may not give the opinion of another expert who will not testify. *Id.* (citing cases); *see also Wolkowitz*, 2008 WL 1885770 at *4 (stating that "an expert may use assistants in performing his work, so long as those assistants do not exercise professional judgment that is beyond the expert's ken.") (internal quotations omitted). In the addendum to her written report, Dr. Schreibman says that she formulated her opinions on her own and that she independently reviewed and agreed with a research article and the "UCLA PTSD Reaction Index forms for children and adolescents" she received from Dr. Shaw. Dkt. No. 98-3 at ECF 32. However, the record presented strongly suggests that Dr. Shaw provided his professional judgment on matters regarding PTSD, about which Dr. Schreibman admittedly lacks expertise, and that Dr. Schreibman is simply conveying the opinions of Dr. Shaw, who will not testify at trial. *See, e.g., In re James Wilson Assocs.*, 965 F.2d 160 (7th Cir. 1992) (concluding that while an "architect could use what the engineer told him to offer an opinion within the architect's domain of expertise, . . . he could not testify for the purpose of vouching for the truth of what the engineer had told him—of becoming in short the engineer's spokesman."). Billing records indicate that Dr. Shaw spent several hours preparing the initial draft of Dr. Schreibman's report. Dkt. No. 98-4 (Schreibman Depo. 22:9-12); Dkt. No. 102-3; Dkt. No. 102-5. While that initial draft does not reflect any opinions by Dr. Shaw (Dkt. No. 115), Dr. Shaw's and Dr. Schreibman's respective

billing records indicate that Dr. Schreibman began her work on the report only after Dr. Shaw's completed his initial draft, and that Dr. Shaw subsequently spent an additional 2.5 hours editing "Dr. Schreibman's Report." Dkt. Nos. 102-3, 102-5.

More importantly, while the District points out that a lack of particularized expertise goes to the weight, not the admissibility, of an expert's testimony, *see United States v. Garcia*, 7 F.3d 885, 889-90 (9th Cir. 1993), defendants have failed to demonstrate that Dr. Schreibman is qualified to offer reliable opinion testimony regarding PTSD based on her "general familiarity" and awareness of that condition. *See, e.g., Jerpe v. Aerospatiale*, No. CIV. S-03-555 LKK/DAD, 2007 WL 1394969, at *7 (E.D. Cal. May 10, 2007) (concluding that an expert's ability to testify about an issue "at a high level of generality" was "insufficient to qualify him as an expert on this issue."). The Court therefore concludes that Dr. Schreibman's proposed testimony must be excluded to the extent she proposes to testify about Dr. Huckabee's opinions and conclusions regarding PTSD. For the parties' guidance, the Court has highlighted portions of that report[6] (appended to this order) that reflect opinions Dr. Schreibman may *not* offer at trial.

However, there being no dispute that Dr. Schreibman is an expert in autism, the Court will permit her to offer opinions, as disclosed in her report, regarding whether C.G.'s behavioral and other issues are consistent with a diagnosis of ASD. Such testimony is relevant and reliable and will assist the trier of fact to understand the evidence or to determine a fact in issue. Although plaintiffs note that Dr. Schreibman did not actually examine C.G. and contend that her review of the record and other evidence was inadequate, such matters go to the weight, not the admissibility of Dr. Schreibman's testimony.

## III.    CONCLUSION

Based on the foregoing, plaintiffs' motion to exclude Dr. Schreibman's testimony is granted in part and denied in part. Dr. Schreibman may not offer opinions regarding the specific assessments she discussed with Dr. Siegel or regarding PTSD, and her testimony will be limited to

---

[6] This is a copy of the report originally submitted as Dkt. No. 98-3.

10

matters concerning ASD consistent with this order.

**IT IS SO ORDERED.**

Dated: June 21, 2021

VIRGINIA K. DEMARCHI
United States Magistrate Judge

**Laura Schreibman, Ph.D.**
Department of Psychology
University of California, San Diego
9500 Gilman Drive
La Jolla, CA 92093-0109

**REBUTTAL TO FORENSIC NEUROPSYCHOLOGICAL EXAMINATION[1]**

## IDENTIFYING INFORMATION

Client: ██████████████
DOB: ███████
Age:  10 years, 2 months
Referring Attorney: Adam Davis, Esq
Date of Report:  3/11/21

## REFERRAL INFORMATION

I was contacted by the law offices of Davis & Young, APLC for the purposes of reviewing the forensic neuropsychological evaluation of Dr. Helena Huckabee and rendering my professional opinion on the conclusions drawn by Dr. Huckabee regarding the client.

This report has been prepared in collaboration with:

Richard J. Shaw, M.D., Professor of Psychiatry and Behavioral Sciences (Child and Adolescent Psychiatry), Stanford University

Pamela Mills, Ed.D., Ph.D., Psychologist and Educational Consultant, in private practice, San Diego and San Francisco.

## SOURCES OF INFORMATION

EDUCATIONAL  RECORDS

▪ Cumulative school records of ██████████████

MENTAL HEALTH RECORDS

▪ Forensic Neuropsychological Evaluation by Helena Huckabee, Ph.D., dated 2/12/21.

**MISCELLANEOUS MATERIALS**

---
[1] **I reserve the right to amend my opinions pending receipt of new records or information.**

- Deposition of Mr. Goodell

## BACKGROUND

████ is a 10-year-old boy who lives with his parents, Heather and James Goodall, and his 3 siblings, in Soledad, CA.  When he was 4 years, 8 months old, he was referred for a special education assessment where it was determined that he exhibited behaviors consistent with a diagnosis of autism (Autism Spectrum Disorder, ASD) and was eligible for special education services.  His first special education classroom placement was at San Vicente Elementary School in the Soledad Unified School District.  This is a classroom for moderate to severely affected students. This is also the classroom in which it is alleged he suffered abuse by his teacher, Mr. Jaime Notheis.  Due to the alleged abuse, ████ parents had him transferred to Gabilan Elementary School, which is a classroom for mild to moderately affected student and thus a less restrictive classroom.  His placement at Gabilan proved to be unsuccessful as ████ exhibited severely challenging behaviors such as aggression and these behaviors negatively impacted his academic progress. He was subsequently placed in an autism classroom the Rose Ferrero Elementary School, a more restrictive program with high structure and supports where it is noted he showed significant improvement in skills and a major reduction in aggression and other severe behaviors.

### Prenatal and Early Childhood History

████ was born on 12/6/10, 2 weeks later than expected, by normal vaginal delivery. His umbilical cord was wrapped around his neck and he required supplemental oxygen at birth. He was delayed in the attainment of his developmental milestones and at age 4-5 years, was evaluated through the school district and diagnosed with moderate to severe autism. He attended preschool, kindergarten and 1st grade at San Vicente Elementary School where he was in the class of Mr. Notheis in which the alleged abuse occurred. Apart from occasional toileting accidents, his parents report that kindergarten was unremarkable. ████ also did not require a Behavior Intervention Plan. ████ broke his right arm in March 2015 after falling off a bunkbed and later in the same year, had a significant fall that resulted in a fractured skull and injury to his spine, and he was hospitalized for one week.

### Allegations of Abuse

It is alleged that ████ was physically, psychologically and sexually abused multiple times during the 2016/17 and 2017/18 academic years between age 5-6 years by his teacher, Mr. Notheis, while a student in a special education class at San Vicente Elementary School. This abuse was alleged to include corporal punishment, behavioral coercion, and the improper use of physical restraint and force, as well as verbal and physical abuse.

In a written statement and deposition given by Jesus Enrique Cuevas, a high school student intern/aide, details of this alleged abuse are more fully described. On 10/26/17, Mr. Cuevas reported that ████ had had a toileting accident and as he reached the classroom, threw himself on the floor, and had a temper tantrum. Mr. Cuevas reported that Mr. Notheis made ████ sit down in a "forceful manner" and instructed another aide, Amanda Camacho, to

leave ███████ sitting in his soiled clothing for a half hour while he was eating his breakfast. Mr. Cuevas reported Mr. Notheis later removed ████████ food and instructed Mr. Cuevas to throw it away, which led ███████ to become angry and throw his plate and crumbs around the classroom. Mr. Notheis then grabbed ███████ by the arm and yelled at him to pick up the plate and crumbs. According to Mr. Cuevas, as ████████ was crying and struggling in his chair, Mr. Notheis repeatedly shoved him and told him to sit in the chair. He then told ████████ to put his head on the table, grabbed ███████ and "shoved" it toward the table as ████████ continued to cry. After breakfast, Amanda Camacho then took ███████ to the bathroom to change his clothes. Mr. Cuevas reported feeling shocked by this incident.

███████ parents were not informed about this incident and learned about it only later on 5/29/18. However, the principal of San Vicente Elementary School, Jaime Calderon, wrote a memorandum to Mr. Notheis on 10/30/17, 4 days following this incident. In the memo, he instructed Mr. Notheis to be mindful of his tone of voice and to treat students and adults with respect, citing that he had often heard Mr. Notheis raise his voice toward the students, and indicated that he was aware that Mr. Notheis had been "physically aggressive" towards some of the students in his class, including physically obligating a student to use the restroom.

In February 2018, Amanda Camacho sent a written complaint to the principal at San Vicente Elementary School regarding alleged abuse of students by Mr. Notheis. In her deposition dated 10/16/20, Ms. Camacho reported that Mr. Notheis had taken students, including ███████ by the neck and forced their heads down, and on one occasion had instructed her to "beat the shit out of him (███████ if he misbehaved.

On 5/15/18, Mr. Calderon sent an email to Mr. Notheis about concerns regarding poor classroom performance and mistreatment of students and staff by Mr. Notheis, following a conference that was held to discuss this matter. Concerns raised included mistreatment of adult aides by Mr. Notheis that included insults, demeaning statements, and derogatory comments, as well as continued mistreatment of students that included being physically aggressive toward some students and often using a harsh tone and overly loud voice in his classroom. Mr. Calderon instructed Mr. Notheis to treat both the classroom aides and students with the "utmost respect," keep his voice low, and refrain from derogatory statements.

On 5/29/18, an officer from the Soledad Police Department met with ███████ father to discuss two incidents regarding their son. These included the incident on 10/26/17 in which it is alleged that ███████ was forcefully grabbed, yelled at by Mr. Notheis, and left in his soiled garments. The second incident discussed with ███████ father was alleged to have occurred on 2/8/18 when Mr. Notheis forced ████████ head and hands onto a desk. This was the first occasion in which ███████ parents were informed that their son had been a potential victim of abuse by Mr. Notheis.

In addition to the specific allegations of 10/26/17 and 2/8/18, there are general allegations of mistreatment by Mr. Notheis with respect to both staff and students at San Vicente Elementary School. These include Mr. Notheis manhandling nonverbal students, pulling the hair of students, and pulling a student by the arm and neck. It is also alleged that he would

physically caress students in an inappropriate manner, for example, on one occasion having a student sit on his lap while he tickled him. ███████ classroom aide, Veronica Garcia, alleged that Mr. Notheis would tickle the inside of ███████ legs "towards the groin area." Amanda Camacho also reported that Mr. Notheis rubbed ███████ stomach and that of other students. She stated that Mr. Notheis regularly grabbed ███████ by his buttocks and thigh areas, hit, flicked, pinched and pulled the ears of children in his class and on occasion left red marks and bruises on ███████ Another classroom aide, Carmen Rangel, reported that Mr. Notheis would blow in ███████ ears, kiss his cheek and touch him, and bounce him up and down on his lap.

## Subsequent School Placements

Due to the alleged abuse in San Vicente Elementary School ███████ (to which Dr. Huckabee attributes ███████ subsequent aggression, toileting issues, disruptive behavior, academic difficulties, etc.) his parents requested he be transferred out of Mr. Notheis' class. He was thus removed from the program and first placed in a summer school program. Teachers in this summer program had positive comments and there were no references to aggression or other severely disruptive behavior. By contrast, in an amendment to his IEP in 2nd grade, on 8/10/18, ███████ SLP documented that he was able to follow routines and was not displaying any major behavioral issues. ███████ extended year (ESY) teacher also reported that ███████ had only limited behavioral issues during summer school, and followed directions when given one direction at a time. Similarly, ███████ school psychologist described him as being able to follow directions when given structure. As a result of these observations, recommendations were made by the IEP team to move him from a moderate/severe program to a mild/moderate program, and indication that he was doing well.

Because of ███████ progress in academics at this point, the decision was made to place him at Gabilan Elementary School, a less intensive/restrictive program. This program, by its nature, did not include the higher level of structure and support ███████ required. In this program we see the onset of physical aggression, elopement, property destruction and other challenging behaviors. ███████ special education teacher, Heidi Lawson, noted on 9/26/18 that ███████ was missing valuable academics and avoided difficult tasks and sought attention by wandering the classroom, touching teacher items, playing on chairs, and throwing items. She believed that the academic rigor of her classroom was too high for his academic levels and that she had had to lower his academic requirements due to his "extreme behaviors" and "short attention span." ███████ remained in this classroom for only 1-2 months.

As it became apparent that Gabilan Elementary School did not provide adequate structure or support for ███████ he was placed at Rose Ferrero Elementary School, in a K-3 Autism Classroom. a more intensive and restrictive classroom than either of his previous elementary schools, with positive results. He showed gains in academics and toileting and both his parents and teachers made positive comments in his IEP notes. In his IEP meeting on 10/4/19, in 3rd grade, his parents reported concerns about him not always cleaning himself and a tendency to develop rashes. He was still wetting his bed at night, and showed

aggression towards others, including pushing and hitting. It was reported that he had not regained the toileting skills he had exhibited prior to his placement in the classroom of Mr. Notheis.  However, his parents commented they had seen a reduction in his aggressive behaviors, and that the length of these behaviors had decreased to 3 to 4 minutes and that he "does not demonstrate the behaviors that he had previously."  In fact, his behaviors were described as "mild" at the time.  ████████ had also met 3/3 of his academic goals, and 3/3 of his speech and language goals.  In addition, his parents reported that he was happy in his new program at Rose Ferrero and approached school without difficulties.  He was also doing well with his academic instruction.


## REBUTTAL TO CONCLUSIONS IN THE HUCKABEE REPORT

It is important to commend and acknowledge the comprehensive and thoroughly detailed reported provided by Dr. Huckabee.  It is apparent that Dr. Huckabee provides the results of a thorough battery of assessments along with her review of other relevant sources.

However, while we are all dealing with the same information, it is clear that there is a difference in opinion regarding the interpretation of this information.  I believe that the data provided by these sources may have very different and alternative interpretations.  It is to this that this report is addressed.

I will begin by addressing specific areas of ████████ characteristics and behavior and present rebuttal to Dr. Huckabee's conclusions (where appropriate).  This will be followed by a summary of my overall opinion and then a discussion of the specific treatment recommendations provided by Dr. Huckabee.

### Toileting Issues

**Claims:** It is alleged that in response to the treatment by Mr. Notheis in his classroom, ████████ started to refuse to urinate in the toilet as an act of defiance and to protest his treatment by Mr. Notheis. In an email from Lori Morones to Jorge Deleon, dated 11/3/17, it is reported that ████████ was wetting himself to gain attention, and that as a result of sitting in his urine-soaked clothes, he developed a rash in his buttocks, scrotum, penis and inner thigh area. These toileting issues were reported by his father to be occurring only at school, and not at home. However, there were allegations of neglect directed towards the parents about their failure to properly seek medical attention for his rash. There is documentation about efforts to treat the rash, which was diagnosed as allergic dermatitis, in the spring of 2018. However, ████████ parents alleged that they were not informed about the practice of allowing ████████ to sit in his urine-soaked clothes without being changed which they believe was responsible for the development of his rash.

████████ mother, in completing the Adaptive Behavior Assessment System in the fall of 2018, reported that he had not had any accidents during that school year during the day after being removed from the classroom of Mr. Notheis. However, in her Executive Summary, Dr.

Huckabee wrote that ███████ remains untrained for toileting and she diagnosed him with Enuresis.

**Rebuttal:** It is apparent that ███████ has had issues with toilet training from an early age. In his deposition, James Goodell (father) reports that ███████ has had wetting issues "from birth." The claim is that ███████ enuresis became worse when in Mr. Notheis' class and in Dr. Huckabee's report this is attributed to ███████ protest and resistance to Mr. Notheis and to the alleged abusive treatment. However, we have no basis upon which to attribute this behavior to "protest" or "resistance" and there is no objective evidence to support this hypothesis. This is a supposition and, in my opinion, likely an unwarranted assumption. There are other potential reasons for this behavior change. Almost all of ███████ behaviors in the San Vicente Elementary School class can be attributed to at least partly, or I would argue, largely, to the fact that the classroom in which he was placed following his alleged abuse was not an ideal match for the severity of his language and behavioral deficits. It is equally plausible to suggest that ███████ was frustrated by his inability to communicate and to successfully navigate the classroom's requirements. Given this situation it is not surprising that urinary incontinence would increase and he would fail to learn appropriate bathroom use.

Further, it is reported that ███████ toilet training progressed as expected at school and that the reports of his incontinence/enuresis seem to be occurring primarily at home. For example, ███████ was assessed by a Behavior Specialist, Rashelle Dadula, on 10/15/18. He was described by Ms. Dadula as not needing assistance to use the restroom or feed himself and that he was independently maintaining "age-appropriate" personal care. If we assume, as Dr. Huckabee does, that his toileting issues are trauma-related, the reverse would be expected to be true. Thus Dr. Huckabee's hypothesis is not supported by the evidence.

**Physical Aggression**

*Aggression in the Classroom*

**Claims:** The first reference to ███████ physical aggression is noted in a Behavior Intervention Plan dated 9/10/18. His plan referenced physical aggression towards peers and task avoidance, which was interfering with both his learning and that of his peers. Aggressive behavior was noted to occur when ███████ peers were present and when non-preferred work was provided. It was hypothesized that the function of his behavior was to escape from academic work. In a meeting with the IEP team, there is also reference to ███████ hitting others, refusing work, and eloping to "evade work." Other examples of his aggressive behavior included hitting peers, throwing chairs and pushing desks. In an observation by his school counselor, Jeannine Hunter, on 9/17/18, ███████ was documented as acting "aggressively" on the playground and that in the classroom, he was "out of control," spit on his desk, refused to clean up, and then lay on the ground, screamed, and would not respond to redirection or verbal prompts. As a result of her observations, Ms. Hunter made recommendations for a smaller classroom environment with a one-to-one aide. His Behavior Intervention Plan included measures to address his behaviors, for example, rehearsing expectations, redirection, reinforcement for calm behavior, and a token system. In a

Functional Analysis Screening Tool completed on 10/4/18, █████ was described as engaging in moderate aggression, stereotypy, and property destruction on a daily basis during transitions, nonpreferred tasks, and academics, and in the presence of other students and adults. In his Functional Behavior Assessment Report dated 10/17/18, behaviors of concern included physical aggression (hitting/kicking), on-task behavior spitting, motor stereotypy, and eloping. █████ behaviors were hypothesized to function as a means of trying to gain attention from staff and students. Dr. Huckabee's opinion is that these increases in physical aggression are solely explained on the basis of his reaction to his alleged abuse and her contention that the behaviors are a manifestation of PTSD.

**Rebuttal:** █████ aggressive behavior became problematic after he left Mr. Notheis' classroom at San Vicente Elementary School and was placed in the less restrictive classroom at Gabilan Elementary School (and yet not, as noted above, immediately after his removal and placement in his summer school program). ==Dr. Huckabee attributes the increase in aggression at Gabilan to the prior alleged abuse. However, this attribution lacks a sound basis and is likely without merit.== As noted above, █████ was placed in a more advanced classroom (Gabilan), which provided less structure and less support than he required. As noted earlier, his teacher, Heidi Lawson, believed that "the academic rigor of her classroom was too high for his academic levels and that she had to lower his academic requirements due to his "extreme behaviors" and his "short attention span." Under these conditions it is not surprising that his severe skill limitations would make what turned out to be an inappropriate placement without the support and structure necessary to address his profound deficits very frustrating and lead to escape/avoidance motivated behaviors such as aggression, property destruction and stereotypy. It is also noteworthy that during the Functional Analysis Screening Tool completed on 10/4/18, █████ was described as engaging in these challenging behaviors on a daily basis during transitions, nonpreferred tasks, and academics, and in the presence of other students and adults. These are precisely the settings and situations where a child with ASD would be expected to engage in these behaviors.

A child such as █████ who has no other means of communication is indeed more likely to adopt such behavior to communicate his displeasure or desire to escape. ==While Dr. Huckabee explains these behaviors on the basis of a diagnosis of PTSD, such behavior need not be attributed to prior abuse or trauma, but rather a means of manipulating his environment by the only means available in █████ repertoire.== This is exactly what the functional analysis revealed. Whereas a neurotypical child might control their environment by engaging in verbal protests or rationalizing, etc., a child without such functional communication skills will use behavior that is a) within their repertoire and b) that works. Studies of children with ASD have also shown a high prevalence of aggressive behaviors, with one study finding that parents reported that 68% had demonstrated aggression to a caregiver and 49% to non-caregivers. Rates of aggression in ASD are also higher in children who have increased social/communication problems, a tendency to engage in repetitive behaviors and symptoms of ADHD (see below).

==Another important point to be made here is that █████ was not reported to be aggressive or destructive while in Mr. Notheis' class. One would expect that if the San Vicente classroom was so traumatic and aversive, █████ would have very likely shown severe==

escape/avoidance behaviors such as aggression, and withdrawal while in Mr. Notheis' classroom.

Also supportive of the conclusion that ▇▇▇▇▇▇ increased aggression cannot be attributed to alleged abuse or trauma is that once he was transferred into the classroom at Rose Ferrero Elementary School with more structure and support (i.e., more intensive) his aggression was greatly reduced as noted in the reports of his teachers and parents documented in his IEP of 10/4/19 (see above). It is likely that this classroom was a better match for his specific level of need and provided a less frustrating environment within which to function successfully. Thus, he had less of a need to escape or avoid settings and situations. If we are to attribute his aggression to a history of abuse, why would it decrease? The history has not changed.

*Aggression Outside Classroom*

**Claim:** Dr. Huckabee referenced ▇▇▇▇▇▇ aggressive behavior described by his parents. This included being aggressive with his siblings and family cats. He reportedly hits and kicks his sisters for no apparent reason. Dr. Huckabee wrote that aggression towards peers is not characteristic of children with ASD but that more typically, children avoid their peers and stay to themselves. She attributes his aggression to his history of abuse and mistreatment. Dr. Huckabee also hypothesized that ▇▇▇▇▇▇ aggressive behavior could be explained on the basis of "alterations in mood and cognition," a symptom of PTSD. She also hypothesized that a student in his classroom "represented some form of trigger" which was prompting him to re-experience the trauma of his abuse.

**Rebuttal:** While it is true that children with ASD are often described as "loners" and prefer to be alone, it certainly is the case that they may be aggressive, and if they are, then siblings are just as likely to be victims as are peers or teachers. Further her hypothesis that the student victim in the class "represented some form of trigger" certainly need not be attributed to abuse. It is not unusual for ASD children to become obsessed or fixated on an object, person, setting, etc. and behave strongly and/or inappropriately in the presence of such things. The literature is filled with examples of children with ASD who form such fixations and it is certainly consistent with my clinical experience. Relatedly, these fixations may be associated with a comorbid diagnosis of Obsessive-Compulsive Disorder (OCD). These fixations have not been attributed to a child's history of trauma or abuse.

▇▇▇▇▇▇ rough handling of his pet cats resembles the behavior of many young children with animals. This includes typically-developing children who may act roughly with animals. Dr. Huckabee's claim that ▇▇▇▇▇▇ pushing the cat's head and feet is a reenactment of the abuse he suffered is entirely speculative and without any support whatsoever. It is also important to comment that notes from ▇▇▇▇▇▇ IEP dated 10/4/19 in reference to this matter state, ▇▇▇▇▇▇ "has cats at home and likes playing with them, but may play too hard with them." This comment, made by his parents, characterizes these incidents in a somewhat different manner from that documented in Dr. Huckabee's report, suggesting that ▇▇▇▇▇▇ unintentionally plays "too hard," and not that it is a manifestation of posttraumatic re-enactment of abusive experiences in his play.

*Aggression and its Relation to Communication Deficits*

**Claim:** Dr. Huckabee argues against the hypothesis that ██████ aggressive behavior was secondary to his communication impairment since he had been just as communication-impaired before the alleged abuse as he was after it.

**Rebuttal:** I completely disagree. I would argue that ██████ aggression was secondary to his inability to communicate in a more acceptable and appropriate manner. Such disruptive behavior is referred to as "functional communication" in that it serves the function of communicating the individual's wishes. A child who is nonverbal and has no linguistic manner of expressing themselves (such as ██████ may certainly discover that aggression gets his point across. There is an extensive literature on this subject and it shows that if a child who communicates by disruptive behavior is taught another response to serve the function of the aggression (e.g., to make a manual sign signifying a task is too difficult) the child adopts the new response. I suspect that prior to his need to escape/avoid he had no real need to be aggressive. Given that he supposedly was presented with abuse and trauma in Mr. Notheis' classroom, it is somewhat surprising that he did not show more of this behavior there.

## Loss of Academic Progress

Age equivalent scores from an assessment by ██████ teacher, Heidi Lawson, on 9/26/18 when compared with the same assessment performed on 9/9/15 document both a lack of progress as well as a regression in the domains of Academic/Cognitive and Mathematics. Dr. Huckabee wrote that such a decline in skills would not have been predicted based on his diagnosis of Autism Spectrum Disorder and that even students with severe autism are expected to make slow, steady progress. She attributed these declines to the damage from the alleged abuse and neglect by Mr. Notheis. Dr. Huckabee wrote that her testing indicated that ██████ had lost at least 5 critical early years of learning which cannot be replaced.

*Cognitive Ability*

**Claim:** Dr. Huckabee, as part of her evaluation, administered the Differential Ability Scales – 2nd Edition to assess ██████ cognitive ability. He did not possess the quality of all language skills to complete the required subtests and his scores on the subtests indicated that he was below 2 years 7 months in the areas of Verbal Comprehension, Picture Similarities and pattern Construction and below 3 years 7 months in the areas of Matrices and Copying. Based on this evaluation, ██████ met criteria for diagnosis of Intellectual Disability, Severe. Dr. Huckabee contrasted these findings with his cognitive testing conducted in September 2015 when his scores were consistent with that of Moderate Intellectual Disability. Dr. Huckabee believes that this discrepancy shows that he has not made the developmental progress that would be expected for a child with autism and attributes this lack of progress to his abuse and neglect by Mr. Notheis in 1st grade.

**Rebuttal:** It is certainly not unusual for a child with ASD, particularly a child with ██████ profile, to fail to make developmental progress when assessed on these

instruments. One cannot interpret lack of increased assessment scores as failing to progress or losing skills. Maintaining test scores at the same level means the child is increasing skills at the same pace as the peers assessed in the standardization of the instrument. However, a child can still make progress, just not at the same rate as peers, and yet score lower on assessments. This is the case even if slow steady progress is occurring. Children with ASD often look better in IQ at age 5 than at age 10 since there is more weight placed on language later on. These children do not understand direction and are often unmotivated to participate in the test administration. Also, the test items become more abstract and while the typical older child can effectively use abstract concepts, the child with ASD is likely to remain at the concrete concept level. In addition, testing, including math skills, requires more verbal comprehension even to establish a meaningful baseline. [redacted] does not have verbal skills sufficient for these assessments. Further, [redacted] did not receive intervention until after the age of 4.5 years and thus the "early" intervention window had largely passed. It is likely that placement in Gabilan Elementary School, where more the more intensive and structured teaching [redacted] required was not provided did not encourage as much academic progress. And his severe disability and failure to have functional language by age 5 are not positive predictors of later outcome.

*Language Functioning*

**Claim:** Dr. Huckabee administered the Peabody Picture Vocabulary Test, 4th Edition to assess receptive vocabulary skills and found him to be performing in the extremely low range below the 0.1 percentile. His scores reflected an age-equivalent performance of 2 years, 6 months, an improvement from similar testing conducted on 10/8/18 when he was performing at an age equivalent of 1 year, 2 months. Dr. Huckabee described this apparent increase as encouraging and demonstrates that [redacted] has the capacity to gain comprehension skills. With regard to expressive vocabulary skills, Dr. Huckabee administered the Expressive One Word Picture Vocabulary Test, 4th Edition and found that his scores demonstrated that he had gained more than 10 months of skills which again demonstrated his capacity for learning.

**Rebuttal:** Here Dr. Huckabee chooses to interpret [redacted] language increases as indicative of his capacity for learning rather than an indication that the alleged abuse did not prevent his progress in this area. <mark>Given that so much is attributed to PTSD, it is interesting that this area of functioning was spared.</mark>

**Claim:** Dr. Huckabee also compared [redacted] age-equivalent scores on the Brigance and found that he had roughly regained the cognitive levels of functioning that he had demonstrated 5 years previously in 2015. On this test, [redacted] obtained age-equivalent scores in the academic/cognitive domain of 1 year, 9 months. Dr. Huckabee attributed his lack of academic progress to the fact that he is "so hypoaroused he scarcely responds to anything" and because he is frequently removed from the learning environment because of severe behavior problems, and no longer attend school around peers who provide good communication partners and positive behavior.

**Rebuttal:** I agree that being removed from the classroom, etc. is not conducive to learning but the reason for removal, i.e., severe problem behavior and "hypoarousal," as noted above cannot be directly attributed to alleged abuse.

*Sensory Processing*

**Claim:** Dr. Huckabee had ▇▇▇▇▇ mother complete the Sensory Profile-2 Caregiver Questionnaire to assess ▇▇▇▇▇ interest in sensory experiences. ▇▇▇▇▇ was described as responding more than others to sound but less than others to movement, body position, and objects in or around his mouth. Dr. Huckabee interpreted these observations as meaning that ▇▇▇▇▇ was less responsive to his environment and "seems dissociated much of the time."

**Rebuttal:** These observations were in contrast to those made by a licensed occupational therapist, whose expertise is sensory issues, in February 2016 when ▇▇▇▇▇ was described as having typical responsiveness to auditory, visual and movement stimuli, as well as increased responsiveness to tactile stimuli. Dr. Huckabee wrote that this decline in responsiveness was consistent with ▇▇▇▇▇ being "markedly hypoaroused and often appears to dissociate." However, the only evidence provided of his "hypoarousal" and "dissociation" is his behavior when with Dr. Huckabee and associate (two strangers) in a hotel room (novel setting) during an evaluation. They do not offer any support that dissociative symptoms were a behavioral feature generalized across settings. Thus, any attribution of "hypoarousal" to trauma and/or abuse is entirely speculative and without objective support. Similarly, Dr. Huckabee's proposed "learned helplessness" being the cause of the hypoarousal is similarly entirely speculative and not supported by any evidence.

**Emotional and Interpersonal Functioning**

**Claim:** As part of her evaluation, Dr. Huckabee obtained ratings from the Behavior Assessment for Children, 3rd Edition from his parents and special education teachers. ▇▇▇▇▇ parents reported him as having clinically significant levels of aggression and problems with functional communication, as well as slightly elevated levels of attention problems and challenges with social skills, leadership skills and completing daily tasks. His father reported clinically significant levels of atypical behavior and slightly elevated levels of conduct problems. ▇▇▇▇▇ special education teacher, Mr. Harvey, rated him as having elevated levels of aggression but denied other concerns about his emotional and behavioral functioning at school. Dr. Huckabee attributed this last observation to ▇▇▇▇▇ underactive and withdrawn presentation. ▇▇▇▇▇ special education teacher, Ms. Parker, reported elevated levels of aggression, attention problems, and withdrawal.

**Rebuttal:** Dr. Huckabee reported elevated scales on this assessment based on Ms. Parker's responding but in her report indicated that Ms. Parker's validity scales suggested viewing the results with extreme caution. This was because Ms. Parker gave inconsistent responses to items that are typically answered in a similar way suggesting that Ms. Parker put in poor effort or attention when completing the form, or that she changed her perspective during the completion of the form. Rather than attributing these behaviors as a consequence of alleged

abuse, it can certainly be argued that ▮▮▮▮▮ is showing symptoms consistent with ASD. Challenges with functional communication, social skills, lack of daily living skills, attentional problems are all features of ASD. ==It is unnecessary, and unsupported, to attribute such behaviors to abuse or PTSD. In addition, it does not fit with Dr. Huckabee's hypothesis that the classroom (the scene of the alleged abuse) is the place where apparently, he is doing better than at home.==

**Claim:** Dr. Huckabee reported that ▮▮▮▮▮ mother completed the Trauma Symptom Checklist for Young Children and described him as having clinically significant levels of Anger/Aggression and elevated levels of Posttraumatic Stress-Avoidance, Posttraumatic Stress-Arousal and Posttraumatic Stress-Total. On the UCLA PTSD Reaction Index for Children and Adolescents – DSM-5 Version, ▮▮▮▮▮ was described as having intrusion symptoms and that he was displaying behavioral signs of re-experiencing by the way that he pushed his cats' heads down forcefully in the same manner that he was abused physically by Mr. Notheis. ▮▮▮▮▮ was described as becoming upset, afraid and/or sad when reminded about the trauma, demonstrated by his reactions when driven past San Vicente Elementary School. He was described to have somatic symptoms such as increased heart rate, headaches, and/or stomach aches. He was also described as avoiding stimuli associated with the traumatic events, with an example provided by Dr. Huckabee being that of avoiding using the restroom during his evaluation. ▮▮▮▮▮ was described as having negative alterations in cognition and mood associated with the traumatic events. For example, Dr. Huckabee writes "he behaves toward others as if he is angry with them for allowing the events to happen and not doing more to stop it or help afterward. He seems to want to get back at someone for what happened."

**Rebuttal:** ==The UCLA PTSD Reaction Index measure cannot be considered an appropriate assessment in this case. This instrument was not standardized with a population of children with ASD. Also, it is a measure completed by the mother, who in this instance might have a particular bias in reporting given the litigation here.==

==It is extremely speculative to conclude== ▮▮▮▮▮ ==was re-experiencing the trauma of his alleged abuse by pushing the cats' heads down forcefully in the same manner as he was allegedly abused by Mr. Notheis.== In my experience I have seen children (typical and with ASD) play roughly with pets and often this is likely reinforced by the cat's behavior (meowing, swatting) and just because the similarity of pushing heads down exists, it does not prove any "re-experiencing" of an event. ==My opinion is that this claim is extremely speculative and without support.== It is also interesting to note that according to ▮▮▮▮▮ father on his latest IEP report (10/1/20) ▮▮▮▮▮ "loves cats."

The claim that ▮▮▮▮▮ avoids stimuli associated with traumatic events is presented by Dr. Huckabee as the reason he avoided using the restroom during his evaluation. This is the evaluation conducted in a hotel room with two strangers and an unfamiliar bathroom. Add to this ▮▮▮▮▮ lack of functional communication skills and it is not surprising he did not initiate or readily access the bathroom. Children with ASD are notoriously affected by novel settings and transitions so his behavior is consistent with his diagnosis and his abilities. ==This seems to be a more reasonable explanation for his behavior.==

The idea that his aggression is due to his anger at others for allowing the events to happen to him and not helping him is highly speculative and cannot be objectively determined. What may be in his thoughts is unknown to us. I see no basis for assuming this is his motivation for problem behavior. Also, I suspect that at his age and with his low cognitive abilities, he would not have the ability or sophistication to deduct the cause of his anger. The Trauma Symptom Checklist for Young Children assumes a developmental level where understanding of causality and past events is above his language concept level. For example, if he was asked to put his head "down" on a pillow, or "up in the air" does he have the receptive capacity to do that? I believe not.

_____ is described as having somatic symptoms such as increased heart rate, headaches, and/or stomach aches when driven past the San Vicente classroom. How were these symptoms determined to exist? _____ would be unable to verbally describe them. Are they reports by the parents? The parents are likely non-objective reporters

**Claim:** _____ seems afraid or scared and he seems to have "trouble feeling happiness or love." Dr. Huckabee wrote that alterations in cognition were consistent with his assessment using the Brigance that showed a decline in academic functioning. With respect to alterations in arousal and reactivity, _____ was described as getting upset easily and behaving aggressively. He was described as seeming jumpy and startling easily, such as in response to loud noises or something that surprised him. He was described as having trouble concentrating or paying attention much of the time. Dr. Huckabee wrote that "marked alteration in arousal was persistently observed during the observation including remarkable hypoarousal and apparent dissociation at times." Dr. Huckabee also comments on _____ lack of "requesting skills."

Based on all of these observations, Dr. Huckabee wrote that _____ was displaying symptoms consistent with Posttraumatic Stress Disorder with dissociative symptoms. Dr. Huckabee also wrote that she considers that _____ will not ever be expected to remit from his symptoms of PTSD because he is functionally nonverbal.

**Rebuttal:** Dr. Huckabee's description of _____ getting upset easily, being jumpy, startling easily and responding negatively to loud noises is, again, consistent with a diagnosis of ASD and in my opinion there is no reason to attribute these behaviors to PTSD. Children with ASD are often observed to cover their ears or leave areas that are loud. Further, they can be upset easily by very small changes in their expected environment. They are also known to be emotionally labile and can show marked variability in arousal. His lack of requesting skills may be attributed to his lack of functional communication skills and lack of social skills. In essence, _____ was displaying symptoms consistent with ASD and severe intellectual disability.

*Adaptive Functioning*

**Claim:** Dr. Huckabee reports that _____ mother completed the Adaptive Behavior Assessment System, 3rd Edition and found his overall level of adaptive functioning to be in



the Extremely Low range at the 1st percentile. Similarly, his scores in the domains of Social skills were in the Extremely Low range at the 1st percentile while his skills used to address personal and health needs were in the Very Low range at the 3rd percentile. By contrast, ▮▮▮▮▮ special education teachers who completed the Vineland Adaptive Behavior Scales, 3rd Edition assessed him as being in the Extremely Low range on the Adaptive Behavior Composite score, and in the areas of Communication Skills, Daily Living Skills and Socialization skills these data were all consistent with his assessment as having a Severe Intellectual Disability. The finding that ▮▮▮▮▮ teachers rated him as being more impaired with respect to adaptive functioning compared to ratings by his mother were used to support Dr. Huckabee's opinion that his worse school functioning could be explained on the basis of his diagnosis of PTSD.

**Rebuttal:** Differences between the reports of teachers and parents are commonly seen. Each see the child in different environments and situations. ==In my opinion, this is not an indication of PTSD. Also, how does this fit with his teachers rating him as less emotionally troubled on the BASC rating scale than his parents?==

Also, ▮▮▮▮▮ scores are so close to the basal on the VABS when you present 1-3 percentile scores that percentile scores are a matter of disagreement on only an item or two.

**Claim:** Dr. Huckabee contrasted her assessment of ▮▮▮▮▮ adaptive functioning with that conducted in October 2015 during a multidisciplinary special education evaluation when his daily living skills were in the Low Average range. Based on that assessment, Dr. Huckabee wrote that ▮▮▮▮▮ may have been able to live independently in a supportive environment such as a group home or host home. However, results of her more recent testing indicated to Dr. Huckabee that ▮▮▮▮▮ would predictably require lifelong supervision and support in an environment such as a residential facility.

**Rebuttal:** Since he had not attended school when he was first assessed, only his mother would have completed the rating scale. It is my experience that parents of students who have intellectual disability and/or autism often rate their children as having higher skills. For this assessment, Dr. Huckabee would have had the benefit of getting the teacher's perspective. And, in fact, Dr. Huckabee reports that for the current assessment, his mother's responses resulted in "notable higher" scores than that reported by his special education teacher.

Unfortunately, there really is nothing to suggest that this child likely would be able to live independently. Given all of his assessments, his severe intellectual disability, his lack of functional communication skills, and his ASD symptomology, it is apparent that ▮▮▮▮▮ has always been severely disabled and will continue to be severely disabled. In my opinion, the prospects for him to live outside a highly supervised environment have been dim. I believe that without PTSD or abuse, his future functioning level would be quite limited.

**Posttraumatic Stress Disorder**

**Claims:** Dr. Huckabee attributed many of ▮▮▮▮▮ aggressive behaviors to his alleged experiences of trauma and diagnosed him as suffering from PTSD. In particular, she

referenced his unexpected episodes of aggression, without any obvious triggers, and stated that such behaviors are characteristic of trauma because they are likely triggered by internal re-experiencing of the abuse. Dr. Huckabee also commented on an incident in which ███████ appeared to be fixated on a particular boy and had a "laughing fit" and described the student as an antecedent to his aggressive behavior. She wrote that the fact that aggression and conduct problems occurred even during preferred tasks was evidence that these behaviors were caused by the former of child abuse. She hypothesized the aggression was a result of the internal re-experiencing of trauma since the behavior was so unpredictable and occurred in situations that would normally be thought to be pleasurable. Dr. Huckabee, in essence, concludes that ███████ suffers from PTSD caused by abuse he suffered in Mr. Notheis' classroom and that due to this abuse ███████ suffers from myriad behavioral, emotional, academic, and physical effects. (These are described in detail above in this report.) Further, she concludes that absent this abuse, ███████ would be functioning at a level allowing him to live in a group home with 5-6 residents and 2-3 staff but now he will need extensive supports for the rest of his life.

**Rebuttal:** Dr. Huckabee's claims in this area are entirely speculative and without merit. It is my professional opinion that the deficits and deviations in ███████ behaviors do not need to be attributed to abuse or trauma but, rather, there are alternative and compelling alternative explanations.

One major issue is Dr. Huckabee's reliance on the UCLA PTSD Index and the TSCYC, which, as noted earlier, are assessments that are not validated in children with autism. Dr. Huckabee relies upon the Trauma Symptom Checklist for Young Children (TSCYC) to make her diagnosis of PTSD. However, the TSCYC has not been validated on children with disabilities, or developmental disabilities, including ASD. As a result, it is not possible to rely upon any data used in the scoring of this measure. In addition, there are specific questions on the TSCYC that clearly might overlap with symptoms of ASD in the case of ███████ For example, Item 5 (Living in a fantasy world), Item 52 (Not paying attention because he or she was in his or her own world) are two questions that would reasonably cause potential confusion in differentiating between autism and PTSD. Similarly, Item 13 (Not wanting to talk about something that happened to him or her), Item 29 (Having trouble remembering an upsetting thing that happened in the past), Item 70 (Acting as if he or she didn't have any feelings about something bad that happened to him or her) are questions the answers to which would be difficult to obtain from a child with the level of speech and language impairment documented in ███████ testing. Finally, ███████ scores on the TSCYC Scale Posttraumatic Stress-Intrusion are at the 17th percentile suggesting that he would be below the threshold needed for a diagnosis of PTSD in this category of symptoms. Thus, it is impossible to draw conclusions of ███████ hypothesized PTSD based on these instruments.

Further, several of the behaviors Dr. Huckabee attributes to trauma are consistent with a diagnosis of ASD. The literature shows that difficulty differentiating trauma and ASD is well documented, which is not surprising in that they share several common features. Common features include: Difficulty with social interactions, lack of interest in peers, oversensitivity to sensory input such as sound or touch, repetitive/stereotypic play, behavior

outbursts, difficulty sleeping, sudden or large changes in mood, and failure to share emotions/affect. His social deficits and social avoidance, communication deficits, sensory responses, difficulties with attention and focus, labile emotional behavior, difficulties with transitions and new environments, disruptive and stereotypic behavior, obsessive/compulsive behavior (e.g., focus on one peer), and intellectual challenges, all speak to ASD as the primary issue here and one does not have to attribute these behaviors with abuse. In fact, such an attribution is unwarranted in my opinion. It is somewhat surprising that Dr. Huckabee does not seem to acknowledge ████████ ASD as an important factor in these behaviors.

Dr. Huckabee mentions aggressive behaviors that are unexpected and without obvious triggers. However, these behaviors are operants (voluntary behaviors) and there are always precipitating events ("triggers") for operants even if they are not obvious to us. Dr. Huckabee suggests that these behaviors are likely triggered by "internal re-experiencing of the abuse." These statements require us to believe assumptions about what was going on in ████████ mind. We are asked to assume that because no obvious triggers presented themselves, that the behaviors must be due to prior traumatic experience. Further, she argues that the fact that aggression and conduct problems occurred during preferred tasks was evidence that these behaviors were caused by the alleged prior abuse. I would argue that by definition, these tasks were certainly not preferred if they led to aggression. We have no idea about internal re-experiencing of trauma especially when other, more objective, plausible, and empirical, causes are apparent.

It is reported that ████████ did start to protest when he was going to school at San Vicente and it is possible that this may have been one symptom of PTSD but is not representative of a full diagnosis. Even when this symptom resolved when he left the San Vicente class and went to summer school and then to Gabilan Elementary School. In his IEP dated 10/1/20, it is also reported by his father that ████████ loves going to class and loves to interact with the staff and students at school.

**Claims:** Dr. Huckabee commented on ████████ presentation in the course of her extensive neuropsychological testing and direct observation of him. She described him as being strikingly underactive and that he sat at the table and remained practically stationary until invited to leave for approximately 2 hours. This is in contrast to his behavior during prior evaluations, for example on 10/8/18. Dr. Huckabee interpreted this behavior as being consistent with a "freeze" response to the trauma of abuse and neglect by Mr. Notheis. Dr. Huckabee wrote that she thought it was predictable that ████████ would continue to develop symptoms of PTSD for the remainder of his life. Dr. Huckabee also commented that ████████ during his evaluation, never initiated any requests or other communication, including requesting to use the restroom. She described ████████ as appearing to "dissociate and stare off" with a fixed gaze lasting 10-11 seconds in duration. In the course of her evaluation, it became evident that he had been retaining his urine was avoidant to approach the restroom. His mood lightened and he flapped his hands and appeared excited after using the restroom. ████████ also exhibited other typical behaviors of children with ASD including limited eye contact, limited speech, echolalia, and hand flapping. Dr. Huckabee also described him as engaging in motor stereotypy, on several occasions, including tipping

his head back and shaking it site-to-side while holding his hands in the air and twirling them, and other times bilaterally flapping his hands. No aggressive behavior was witnessed. Overall, Dr. Huckabee described ███████ presence as "alarmingly passive, excessively compliant, and frozen with typically flat affect and dysthymic mood." She described him as sitting motionless with his arms by his side and that the lack of movement or exploration of enticing materials was "developmentally pathologic."

**Rebuttal:** Dr. Huckabee attributes ██████ passivity and "frozen" demeanor as reflecting the effects of PTSD. Yet other interpretations present themselves. The child was placed in an unfamiliar environment, with unfamiliar people, and presented with demands. In such a situation it is not unusual for a child to be more subdued. He also needed to use the bathroom and was likely physically uncomfortable. In fact, ██████ appears to be functioning at about the 4-year-old level and 4-year old children may in fact fail to initiate bathroom requests, particularly in unfamiliar environments. The bathroom was unfamiliar to him and it is reasonable he would avoid it. Once he did use the bathroom he apparently became more active – albeit exhibiting behaviors of ASD. Describing the subdued behavior as a "freeze" response or "learned helplessness" attributable to PTSD goes far beyond the data and cannot be substantiated.

In addition, Dr. Huckabee attributes his aggression and disinhibited behavior as also being due to PTSD. It seems Dr. Huckabee explains very different and opposite behaviors to abuse. But one cannot have it both ways.

██████ parents reported that they believed that he was waking up crying as a result of having nightmares, following his experiences with Mr. Notheis. However, typically developing children begin to experience nightmares between the ages of 3 and 6 years. We have no objective basis to attribute his waking and crying to prior abuse.

**Claim:** Dr. Huckabee wrote that ██████ has missed out on necessary learning and education at a critical time in his development and that these missed opportunities have significantly diminished his potential to remediate his symptoms and build critical skills. She believes that had he not been abused, he would now have stronger communication skills but as a result of his abuse, he has become so avoidant of people, places and materials that he now lacks the foundational skills to acquire necessary communication skills to treat his Autism Spectrum Disorder.

**Rebuttal:** Dr. Huckabee's position that it is due to abuse that ██████ has missed out on necessary learning and education opportunities can certainly be refuted by the fact that ██████ has ASD and severe intellectual disability. Many skills considered "foundational" are built in the first three years of life, more so in the first 5—before ██████ ever hit kindergarten. His lack of verbal ability at the time of his first IEP already offered a poor prognosis for development of spoken language/ higher order reasoning and other skills. Based on his history and original assessments, plus the rather late onset of any intervention, I am not surprised that he has not shown greater progress.

**Claim:** Dr. Huckabee concludes her report by stating that ▮▮▮▮ has suffered severe and irreparable harm and that as a result of his lack of verbal and cognitive abilities, his ability to participate in effective trauma treatment is limited and that the damage from his abuse and neglect is expected to be lifelong. She wrote that ▮▮▮▮ remain largely dependent upon therapeutic environments and the skills and presence of highly trained and numerous professionals to keep him safe and ensure his well-being.

**Rebuttal:** It is my opinion that ▮▮▮▮ indeed will remain largely dependent upon therapeutic environments and that his severe disability is likely lifelong. However, it is my opinion that this is not due to PTSD or the alleged abuse, and that the outcome would have been the same with or without trauma.

## DR. HUCKABEE'S RECOMMENDATIONS FOR FURTHER EVALUATION AND TREATMENT

Below I address Dr. Huckabee's recommendations for ▮▮▮▮ future evaluation, treatment and education.

1. RE-EVALUATION: It is recommended that ▮▮▮▮ be formerly re-evaluated by a psychologist specializing in Autism Spectrum Disorder in 12 months and approximately every 3 years thereafter to assess his progress and update treatment goals.

*According to* ▮▮▮▮ *2019 IEP, he is due for his triennial assessment as stipulated by the Individuals with Disabilities Education Act (IDEA) in October 2021 and then every three years thereafter. This is routine and a service provided by the school district. There is no increased need for this based upon a diagnosis of PTSD or alleged abuse.*

2. ABA TREATMENT: Dr. Huckabee recommends that ▮▮▮▮ receive individualized ABA treatment at home to address his significant skill deficits. This should include a strong parent-training component to assist his family in successfully and safely managing ▮▮▮▮ at home as well as building critical communication and adaptive skills. Because of his currently apathetic and frozen profile, combined with episodes of severe behavior that result from his traumatic experience, ▮▮▮▮ requires 1:1 intervention at a dose of approximately 6-7 hours per week, performed by a BCBA who has expertise with trauma-informed ABA.

*There was no documentation or data presented suggesting that the student exhibits "frozen or flat affect" across settings. That presentation was reported to be exhibited while being assessed in a hotel room with two strangers. In fact, in this second and most recent assessment ▮▮▮▮ is described by Dr. Huckabee as smiling and willingly participating in activities. This is in contrast to the "frozen" or "flat" demeanor upon which Dr. Huckabee depends for her attribution to abuse and subsequent PTSD. It is also noteworthy that on his October 1, 2020 IEP his is described by his teachers as a "sweet boy" who always greets them with a smile, smiles during virtual morning*

*meetings, loves to cut and paste, loves to sweep and vacuum at home and helpful when he wants to be.*

*Further ABA treatment, by its own definition, includes careful monitoring of child progress and any determination of number of hours or direction of the intervention is data-driven. Artificially stipulating a specific number of hours is inappropriate. Dr. Huckabee also here attributes* ▇▇▇▇ *"frozen" demeanor on the alleged prior abuse yet there are no data to support this attribution. We have only one instance where he is described as having flattened affect and this is from Dr. Huckabee's observation when* ▇▇▇▇ *was in Dr. Huckabee's presence during her assessment. It is not unusual for a young child to exhibit little emotion or what some professionals describe as having flat affect when taken to a stranger for an assessment. This presentation is often attributed to the child being shy in a stranger's presence or cautious in an unfamiliar setting.*

*Treatment based upon ABA is available via his educational setting and there is no increased need for the level of these services based upon PTSD and unrelated to the alleged abuse.*

3. TRAUMA FOCUSED PLAY THERAPY: ▇▇▇▇ now requires Play Therapy Services to be delivered by a Clinical Psychologist, qualified LPC, LMFT who has competence in the treatment of trauma with comorbid Autism Spectrum Disorder and Intellectual Disability. ***This would not have been necessary prior to the abuse inflicted upon*** ▇▇▇▇ ***in his special education classroom.***

*I acknowledge that* ▇▇▇▇ *treatment by Dr. Notheis may have been traumatic, and there were changes in his behavior in his classroom (increased incontinence, not wanting to go to school, possible sleep issues). However, traumatic though it may have been, its impact at the time was of brief duration (he did well in summer school) and not severe enough to warrant a PTSD diagnosis. However, in an abundance of caution, it is reasonable to support a brief 6-month course of weekly trauma-focused play therapy to address any possible residual symptoms that may have been related to his experiences in Mr. Notheis' classroom. This treatment would best be delivered at school in the setting where he is currently most familiar and comfortable.*

4. PSYCHIATRIC CONSULTATION: ▇▇▇▇ now requires ongoing psychiatric care including evaluations at transition points (estimated at 8/lifetime) such as moves, family deaths, and other important events. ***This would not have been necessary prior to the abuse inflicted upon*** ▇▇▇▇ ***in his special education classroom.***

*It is appropriate for a child with ASD to receive a psychiatric consultation at major developmental phases, such as puberty, and in* ▇▇▇▇ *case, in the event of the emergence of new symptoms that sometimes develop, for example, new symptoms of aggression or obsessive-compulsive behavior. However, this standard practice would be provided independent of any alleged abuse or diagnosis of PTSD. In the case of* ▇▇▇▇ *it is important to note that based on his 2018 IEP, he did not have significant*

*behavioral symptoms that were thought to warrant treatment with psychiatric medications. Even the diagnoses made by Dr. Huckabee are ones that are treated primarily with behavioral interventions, and not with medications. If future behavioral issues emerge, ▮▮▮▮ should receive a psychiatric evaluation, but there are no data to support the opinion that future such issues have any relationship with his experience in Mr. Notheis' classroom. The fact that ▮▮▮▮ behavior is improving, as reported by his teachers and acknowledged by his parents, suggest that the opposite is true.*

5.  PSYCHOTHERAPY SERVICES: Should ▮▮▮▮ regain the necessary verbal or symbolic skills necessary for participation, he would necessitate psychotherapy services provided by a Clinical Psychologist, qualified LPC, or LMFT who has competence in the treatment of trauma with comorbid Autism Spectrum Disorder and Intellectual Disability. ***This would not have been necessary prior to the abuse inflicted upon ▮▮▮▮ in his special education classroom.***

*Dr. Huckabee mentions ▮▮▮▮ "regaining" verbal or symbolic skills where in fact he never had such skills, especially at the level required for participation in psychotherapy. At this time, based on his baseline assessment prior to his placement in Mr. Notheis' classroom it is not likely to expect him to benefit from these services. Also, this recommendation is predicated on the accuracy of Dr. Huckabee's diagnosis of PTSD, which I dispute. Should the need for future counseling and other therapeutic services arises, these services would be routinely delivered by the school district in the context of his IEP. I believe that there is no increased need for such services based upon the PTSD diagnosis nor the alleged abuse.*

6.  FAMILY THERAPY: ▮▮▮▮ family now needs family therapy services to assist his parents in coping with the trauma of abuse. This should be provided by a Clinical Psychologist, qualified LPC, or LMFT who has competence in the treatment of trauma with comorbid Autism Spectrum Disorder and Intellectual Disability. ***This would not have been necessary prior to the abuse inflicted upon ▮▮▮▮ in his special education classroom.***

*There is no substantiation that ▮▮▮▮ has PTSD nor any substantiation that his family has required more assistance and support than any family with a child with ASD and intellectual disability. Should the need arise for services, the Regional Center would cover this. Again, I do not believe there is an increased need for this therapy based upon PTSD nor alleged abuse.*

7.  INDIVIDUAL COUNSELING FOR PARENTS: ▮▮▮▮ parents now require individual therapy services to assist parents in coping with the trauma associated with the abuse of their disabled son. This should be provided by a Clinical Psychologist, qualified LPC, or LMFT who has competence in the treatment of trauma with comorbid Autism Spectrum Disorder and Intellectual Disability. ***This would not have been necessary prior to the abuse inflicted upon ▮▮▮▮ in his special education classroom.***

==Please see comment above.==

8.  RESPITE CARE: █████████ family needs access to regular respite care in order to provide necessary restorative time from the chronic stress of parenting a child with ASD, Intellectual Disability and PTSD. ***The necessity of this has increased due to the abuse inflicted upon*** █████████ ***in his special education classroom.***

*Respite care is routinely authorized and provided by the Regional Center.  While respite care is appropriately offered to children with ASD and other developmental disabilities, there is no evidence to show that the need for these services has increased as a result of* █████████ *experiences with Mr. Notheis,* ==*particularly in the absence of data to support a diagnosis of PTSD.*== *And again, I believe* █████████ *family would benefit from Respite Care* ==*but not because of PTSD, per se, since I do not believe this is an appropriate diagnosis for this child.*== *It is very noteworthy that recent IEP reports suggest that both* █████████ *teachers and his parents are quite happy with his progress and are very content with his program.  On 10/1/20, it is documented that* █████████ *is very helpful when he wants to be and that he likes to sweep and vacuum at home.  Also, there is no evidence in the record of the parents requesting additional support.*

9.  INTERDISCIPLINARY COLLABORATION: █████████ needs a specialized team of professionals who are trauma-informed to develop and guide all aspects of his education; this means that all decisions and actions need to be based on his entire context, including his history of abuse, diagnoses, and his needs related to the trauma he has experienced—not just on the educational deficits or challenging behaviors he may display. This can only be done through an interdisciplinary team of highly trained professionals in trauma, autism, and neurodevelopmental disorders. This interdisciplinary team would involve the services of the following professionals: Licensed Psychologist or Neuropsychologist, Board Certified Behavior Analyst (BCBA), Certified School Psychologist, Speech Therapist, Occupational Therapist, Special Education Teachers, and other school staff that are highly trained in these areas.

*Interdisciplinary care reflects common good practice and will be provided through* █████████ *IEP. Such professionals are routinely part of the child's review team during IEP meetings and additional consultations.  These professionals are credentialed in their areas.  In addition, if the parents want to have any additional person involved in educational decisions they can invite anyone they wish.*

*What is provided by the school should be enough for a child with ASD* ==*and there is no increased need due to PTSD nor the alleged abuse.*==

**Recommendations for Academic Settings:**

1. ▮▮▮▮ should be eligible to receive special services through his local school district under an Individualized Education Program (IEP) recognizing his multiple diagnoses as listed above. Specifically, ▮▮▮▮ should be eligible to receive educational services including, but not necessarily limited to, the following:

   a. INDIVIDUALIZED / SPECIALIZED SETTING: ▮▮▮▮ must be educated in a highly individualized and specialized setting.

   i. Due to ▮▮▮▮ substantial lack of communication and initiation skills, significant physical aggression and history of elopement, ▮▮▮▮ requires a 2:1 professional (details below) to student ratio. ***This would not have been necessary prior to the abuse inflicted upon ▮▮▮▮ in his special education classroom.***

   *It is my opinion that ▮▮▮▮ should have services focused on his needs as a child with ASD and intellectual disability.* ==*I believe that the level of services he requires would be the same with, or without, PTSD or the alleged abuse.*== *The 2:1 professional to student is extremely restrictive and it has not been determined that he requires such a restrictive setting. The fact that ▮▮▮▮ was doing well during his pre-COVID in-person participation at Rose Ferrero suggests that the level of staffing, which did not include a 2:1 staff ratio, was adequate to support his academic progress which Dr. Huckabee notes, for example, in his speech and language skills, in her report. Also, in his most recent IEP in October of 2020 it is clear that ▮▮▮▮ has been making significant gains with the 1:1 level of support he is now receiving.*

   *There is no evidence in the record that ▮▮▮▮ has a history of elopement. He might run across the room but there is no evidence that he runs out into the street, jumps fences, etc.*

1. Staff working with ▮▮▮▮ need to be highly attentive to his needs (including feeding and toileting) as his detrimental lack of communication makes him susceptible to neglect and abuse.

   *▮▮▮▮ educational program would support his needs through his IEP and this is consistent with good programming.*

2. This should occur until ▮▮▮▮ is restored to the point of being able to access needs in his surroundings and his frozen and flat affect is diminished.

   *Again, there is no substantiation to the argument that has ▮▮▮▮ "frozen" or "flat" affect in his special education setting. In contrast, in ▮▮▮▮ most recent IEP (10/2021) there is no mention of a flattened affect and, conversely, he is reported to be friendly and enjoying his teachers.*

3. Because of his vulnerability to future abuse, ▮▮▮▮ ***should not be left alone with any provider. There should always be a second safe adult present with*** ▮▮▮▮

*There are no data to support that* ███ *cannot be left alone with a provider. This was not the case when he was attending school at Rose Ferrero in person and such a measure would not be in keeping with the principle of educating him in the least restrictive educational setting.* ==*Absent the substantiation of PTSD due to abuse, there are no data to support this recommendation. There is no increased need for this service based on the alleged abuse.*==

ii. TRAUMA SENSITIVE: ███ requires a school setting that is trauma- sensitive and whose leadership supports and fosters a trauma-sensitive learning environment. Whole-school trauma sensitivity requires more than just an awareness of trauma's impact on learning. Everyone—administrators, educators, paraprofessionals, parents, other students, custodians, bus drivers, and lunch personnel that may encounter ███ must be part of a school-wide intervention that understands and is able to respond in ways that are supportive and appropriate to ███ needs and behavior challenges in order to prevent worsening of his symptoms. The following website is helpful in this regard: (https://traumasensitiveschools.org/wp- content/uploads/2013/11/HTCL-V ol-2-Creating-and-Advocating-for- TSS.pdf) ***This would not have been necessary prior to the abuse inflicted upon*** ███ ***in his special education classroom.***

*These arrangements are part of good care and as such, should be implemented by the school. This is independent of any alleged abuse.*

a. SAFE PHYSICAL BOUNDARIES: Presence of safe physical boundaries throughout the school environment, such as fences, gates, or walls that cannot be transgressed by ███ (E.g., ███ should be able to regularly access a playground with fences that are sufficiently tall, without opportunities for independent egress, and unscalable.) His placement must not rely solely on supervision of adults to keep him within safe physical boundaries and proximity as such an arrangement would represent a significant safety risk for ███ Additionally, given his history of abuse, safe physical boundaries and environmental modifications will reduce the necessity for hand-on physical interventions to keep ███ safe. ***The necessity of this has increased due to the abuse inflicted upon*** ███ ***in his special education classroom.***

*Again, this is standard good practice and would be important for any child. This also assumes* ███ *has a history of elopement leading to running away from school, scaling fences, etc. but his educational record does not substantiate this.*

b. QUALIFIED BCBA/EDUCATOR: ███ complex behavioral needs require that he be educated by a BCBA with a 1:1 ratio. All staff working with ███ need to be highly trained in Applied Behavior Analysis. This requirement must be also considered with respect to staff turnover and absences. Licensure in special education alone will be insufficient for those educating ███ given his severe lack of communication skills, multiple diagnoses, and history of trauma. ***This would not have been necessary prior to the abuse inflicted upon*** ███ ***in his special education classroom.***

*Possessing a BCBA and having extensive training in ABA does not necessarily mean a person is skilled at working with children with ASD. It has been my experience (of many, many years) that more is required than just a knowledge of behavioral principles. I have seen many BCBA certified people who have absolutely no skill at working with these children. To suggest that licensure in special education will not be sufficient supposes information on the knowledge and skill of this individual. Obviously, the schools believe that professional staff who are licensed in the areas of special education, occupational therapy, speech pathology, etc. have documented proficiency for obtaining licensure and that they are skilled and appropriate to perform in their area of expertise. There is absolutely no basis upon which to say otherwise in this case. I believe Dr. Huckabee's assertion here is unwarranted.*

*Further, the need for a highly qualified professional would have been the same and there is no increased need due to PTSD or alleged trauma.*

c.  MOTIVATING STIMULI: ▮▮▮▮▮ will need regular access to motivating stimuli which changes frequently and the capacity of his educator to regularly administer preference assessments. Punitive consequences should never be used to motivate ▮▮▮▮▮ given his trauma history.

*This is good practice.*

d.  ACCESS TO PROTECTIVE DEVICES AS NEEDED: Staff working with ▮▮▮▮▮ need access to protective devices for themselves as needed, and potentially for ▮▮▮▮▮ It is unsafe for ▮▮▮▮▮ and staff working with him if this cannot be assured.

*Again, this is good practice and would be available in a school program.*

e.  SKILLED IN SIB/SEVERE BEHAVIOR REDUCTION: It is essential that multiple staff members   be sufficiently trained with ▮▮▮▮▮ and severe behavior reduction strategies, especially including the functional analysis of behavior (FA). Absence of a staff member who is skillful in the implementation of procedures effective in reducing his aggression and property destruction would result in ▮▮▮▮▮ becoming a danger to himself and those fellow students and educators around him.

*Again, this is good practice.*

b. (sic). HIGH STAFF TO STUDENT RATIO: ▮▮▮▮▮ necessitates a 2:1 staff to student ratio to promote his safety and the safety of fellow students and educators. Due to his vulnerability to abuse, he should never be left alone with a staff member. ***This would not have been necessary prior to the abuse inflicted upon*** ▮▮▮▮▮ ***in his special education classroom.***

*I am not convinced he would require such a highly restrictive setting (see comments above). I believe such a decision needs to be data-driven and there have been no data*

*presented to support this. Further, his most recent IEP indicates he is doing well with his current 1:1 intervention.*

f. CONTINUOUS DATA COLLECTION: Continuous data collection of all maladaptive behavior, particularly aggressive and destructive behaviors. This ensures the detection of changes in the rate, frequency, and intensity of critical and dangerous behaviors and constant assessment of efficacy of strategies being used.

*Good practice.*

g. EXTENDED SCHOOL YEAR: Compensatory Extended School Year services are recommended due to history lack of access to appropriate educational services. The extended school year services should match the recommendations above.

████ *already receives ESY services.*

c. (sic) PHYSICALLY/EMOTIONALLY SAFE ENVIRONMENT: Given ████ history of abuse and very limited communication skills, it is recommended that any school placement considered be free from any suspicion or allegations of abuse. Further trauma, including being exposed to the abuse of other students, would substantially worsen his fragile state. ***This would not have been necessary prior to the abuse inflicted upon*** ████ ***in his special education classroom.***

*I believe this is a feature of any good educational environment independent of a specific history of alleged abuse.*

2. The above-described educational placement needs to remain in place until:
1. ████ is no longer behaving dangerously in the face of common educational activities. This can be recognized as ████ being able to appropriately regard and hold educational materials and successfully maintain proximity (~2 feet) with an educator, even in the absence of demands, without egressing or otherwise behaving dangerously.
2. When ████ maladaptive behaviors have successfully been eliminated in all settings for about 6 months, then new placements can be gradually introduced.
3. When ████ has sufficient basic communication skills to access basic necessities such as drinks, food, a restroom and breaks as needed.

*These goals are reasonable and would be included in his IEP, as deemed appropriate, and monitored with data collection. Informed decisions relating to changes in his program will be determined by these data.*

3. TRAUMA INFORMED BEHAVIOR SUPPORTS: Educators working with ████ need to be trained to provide Trauma-Informed Behavior Supports (TIBS), which embodies both Trauma Informed Care as well as ABA techniques and tools. If ████ is triggered in the school environment, it is likely that he will be unable to focus on his



instruction and learn. Teachers and individuals working with  should be able to demonstrate mastery of the following skills:

a. Effective alternatives to coercive interactions (such as seclusion, restraint, or punishment as well as badgering and shaming).

   b. Recognition of signs and symptoms of trauma and how to respond appropriately.

c. Understanding of typical reactions of individuals with ASD exposed to trauma as well as developmentally appropriate responses.

  d. The ability to identify and avoid situations that may be re-traumatizing; and to list known triggers, environmental events, and other stressors and be able to modify the environment to prevent these from occurring.

e. Awareness of environmental events in the moment that may be impacting behavior. Demonstration of ability to respond appropriately when a student is triggered.) ***This would not have been necessary prior to the abuse inflicted upon*** ▇▇▇ ***in his special education classroom.***

*These are all features of good programming and would be available in his school program. However, I believe are good features for any program serving individuals with ASD, regardless of alleged abuse.*

4. FUTURE PARTICIPATION IN SMALL GROUPS: As ▇▇▇ skills improve, he could be a candidate for education in a small group setting with 2 or 3 other students. In addition, ▇▇▇ could potentially also participate in some electives such as adaptive physical education or art, but these placements will require the absence of maladaptive behaviors as well as consistent individual support by a highly skilled educator familiar with ▇▇▇ and skillful in the implementation of his BIP.

*This would be included in his school program IEP.*

5. REMEDIATE COMMUNICATION DEFICITS: Although ▇▇▇ has maladaptive behaviors in his repertoire, it is imperative that the major factors contributing to ▇▇▇ problematic behaviors be addressed as well. Specifically, ▇▇▇ severely limited ability to communicate makes him vulnerable to communicate with maladaptive behaviors. Selection of his IEP goals should be completed by a Board-Certified Behavior Analyst skilled in developing communication skills to teach these developmentally appropriate goals.

*Strategies for remediating* ▇▇▇ *communication deficits and IEP goals should be determined by his education team. This would likely include a variety of relevant professionals, and might well include a BCBA-certified individual. However, I do not*

*believe a BCBA would necessarily be required if other appropriately trained and credentialed professionals were involved.*

6.  BEHAVIOR INTERVENTION PLAN: It is essential that an effective Behavior Intervention Plan (BIP) be consistently coordinated by a Board-Certified Behavior Analyst (BCBA) in cooperation with his teachers and parents. Such a high level of qualifications as found in a BCBA is necessary given the severity of █████ behaviors. The BIP must be developed using ABA technology to address elopement behaviors, aggressive behaviors and improve ███████ communication. The goal is to improve behavior and increase ████████ acquisition of communication, academic and functional life skills. Unless this is addressed effectively, ████████ ability to participate in his school and community will be severely limited.

    *See comments directly above.*

7.  SPEECH LANGUAGE THERAPY SERVICES: ████████ needs regular, direct services and consultation with a Speech Language Pathologist who is skilled in addressing communication deficits associated with Autism Spectrum Disorder. This individual should be in close consultation with ████████ supervising BCBA to ensure continuity of care, given his especially fragile behavioral state at this time.

8.  OCCUPATIONAL THERAPY SERVICES: ████████ needs regular, direct services, and consultation with an Occupational Therapist who is skilled in addressing sensorimotor deficits associated with Autism Spectrum Disorder. This individual should be in close consultation with ████████ supervising BCBA to ensure continuity of care, given his especially fragile behavioral state at this time.

9.  HOME AND RECREATIONAL SERVICES: ████████ would benefit from the opportunity to attend summer camps for children or adults with disabilities and/or victims of abuse in order to provide him with opportunities to socialize with individuals of similar abilities and have appropriate and necessary supports for his participation.

10. NONCOMPETITIVE SPORTS: ████████ would benefit from the opportunity to participate in sports with others of similar age or ability. Special Olympics is one private organization that would be a good fit for ████████

11. SOCIAL AND RECREATIONAL CONSULTATION: ████████ family needs consultation for trained support while engaging in recreational activities in the community. Such support will enable them to foster ████████ participation in community-based social events and recreational opportunities.

    *Services listed directly above as points 7 through 11 are all parts of a special education student's services and would be provided by ████████ school.*

12. TRAUMA INFORMED TOILET TRAINING: Given the historical pairing and association between toileting and abuse, it is critical that any treatment focused on developing this crucial life skill be trauma-informed. ***This would not have been necessary prior to the abuse inflicted upon*** ███████ ***in his special education classroom.*** Specifically, the following must be considered:

   a. For ███████ elimination was historically paired with events that threatened his safety (physical abuse and neglect), representing a history of aversive conditioning to eliminating.

   b. The stimuli associated with eliminating have likely become conditioned punishers. Thus, similar stimuli may act as establishing operations, altering the value of escape as a form of negative reinforcement. It is more likely than not that a restroom or similar environment, or the need to eliminate have become a discriminative stimulus for escape behavior.

   *There is a great deal of unwarranted assumption and speculation here. We have absolutely no data to support these suppositions. We would need an experimental analysis to validate these points and absent that, we are likely best served by adopting a good toilet training program. Dr. Huckabee's proposal here is predicated on her assumption that* ███████ *suffers from PTSD and I not only dispute her conclusion about this but I do not see how such an assumption would make any difference in how a toilet training program was implemented. I do not know what "Trauma Informed Toilet Training" is and I was unable to find any information on such a program. In addition, we must remember that* ███████ *parents now say his is doing well with toileting, has fewer accidents, and cleans himself after an accident.*

13. MANAGE ELOPEMENT BEHAVIORS: ███████ history of elopement (wandering, bolting, or leaving home or school without supervision) puts him at risk of harm. He should be monitored 1:1 at all times. To the extent that elopement behaviors continue to be a challenge for ███████ and his family, the following strategies are offered:

   a. For individuals with a history of elopement behaviors, it is always critical to have emergency identification on them. This may be in the form of a traditional state- issued ID, a medical ID bracelet or a laminated card placed in his pocket or otherwise affixed. Contact information for caregivers should also be included. It may also be useful to provide information to the local law enforcement agencies about ███████ including a description of his needs, his picture, possibility of elopement and information about how to approach and assist an individual with Autism Spectrum Disorder.

   b. Many GPS safety products are also available for monitoring ███████ 's whereabouts should he elope, aiding in his expedient and safe return home: https://www.autismspeaks.org/family-services/resource-library/safety- products

   c. Antecedent or environmental modifications. ███████ environment can be changed or modified to reduce or eliminate the likelihood of elopement. This could include, but is

not limited to, options such as sufficient safety mechanisms on window locks/door handles or fences that are safe, tall, and not scalable. Alarms can be used to assure his safety in the home and school.

d. A functional analysis (FA) should be administered to determine the precise functions of ███████ 's elopement behavior prior to the implementation of consequence-based strategies.

e. Noncontingent reinforcement (NCR) provides access to the consequences motivating elopement on a time-based schedule, presumably satiating the individual and reducing motivation for elopement behavior.

f. Differential Reinforcement of Other Behavior (DRO). Reinforcers can be offered at predetermined periods where elopement did not occur.

g. Differential Reinforcement of Alternative Behavior (DRA). Reinforcers for behaviors that are alternative to the behaviors of elopement can delivered immediately after the occurrence of the behavior. For example, ███████ could be reinforced immediately and frequently for holding a caregiver's hand or staying in proximity to them.

h. Functional Communication Training (FCT). ███████ can be taught to communicate what he wants rather than eloping to access it. This should be used in conjunction with a functional analysis. The method of communication must be in ███████ repertoire in order to serve as an alternative to elopement. For example, if ███████ wants to leave an area or access something, he could verbalize this or use an alternative augmented form of communication.

*All of the above points in #13 are included in a good behavioral program and can be implemented at school. There is no substantiation that eloping is a problem. His current school reports do not say anything about eloping.*

14. PIVOTAL RESPONSE TREATMENT: Teaching Pivotal Behaviors using Pivotal Response Treatment (PRT) was successfully utilized during this evaluation.

a. Given ███████ ongoing struggles with spontaneous verbal communication and self-initiation, it is recommended that Pivotal Response Treatment (PRT) strategies be utilized to increase his skills in the area of socialization, communication, and behavior. PRT is an empirically supported naturalistic intervention in which the child plays a critical role in determining what activities and objects will be used in treatment.

b. Information regarding special events and training available at The Koegel Autism Center at UCSB is available on their website https://education.ucsb.edu/autism.

c. Books and manuals outlining PRT strategies are also available on their website https://education.ucsb.edu/autism/services-products/books-manuals.

*While a specific methodology is not listed on an IEP, as a co-developer of PRT I am most familiar with it and can attest it is readily used in classrooms across the country, and, indeed, worldwide. PRT is part of a larger group of interventions referred to as Naturalistic Developmental Behavioral Interventions (NDBI) and these interventions all*

*feature specific procedural characteristics. In essence, I would assume any NDBI approach would help* ▮▮▮▮ *and would be implemented in his school program.* ==*And again, I do not see any increased need for this based upon a diagnosis of PTSD or the alleged abuse.*==

15. CRISIS INTERVENTION TRAINING: Educators must be trained and certified in Crisis Intervention Training that teaches appropriate strategies in which they can respond to ▮▮▮▮ challenges, including training on how to safely remove him from difficult situations, effective de-escalation techniques, avoidance of restrictive interventions, de-briefing, and post-intervention connection. ▮▮▮▮ lacks the coping strategies to deal with triggers effectively. It is vital that ▮▮▮▮ be able to look to the teachers in his environment for support and comfort. His teachers need to understand ▮▮▮▮ vulnerability to sudden changes and/or disruptions in his environment, which frequently results in his viewing their world as "unsafe" and "scary". Interventions need to focus on offering support and reassurance, while at the same time helping ▮▮▮▮ express his feelings. ***This would not have been necessary prior to the abuse inflicted upon*** ▮▮▮▮ ***in his special education classroom.***

*This needs to be available for any child. Interestingly, Dr. Huckabee mentions that* ▮▮▮▮ *lacks the coping strategies to deal with triggers effectively. However, no substantiation for this is provided in her report.*

*His "vulnerability to sudden changes and/or disruptions in his environment" is consistent with a diagnosis of ASD where such changes in environment, routine, or expectations are renown to cause the child to become very upset.* ==*In essence, this is ASD, not PTSD.*== *It is also noted in his 2015 IEP that he had trouble with transitions so this was an issue prior to the alleged abuse.*

**Recommendations for Long Term Care:**

1. LONG TERM RESIDENTIAL CARE: As a result of abuse by Mr. Notheis, ▮▮▮▮ now has marked symptoms of unprovoked aggression and hypoarousal manifesting in intermittent dissociation and underactivity. These symptoms mean that ▮▮▮▮ does not get even his most basic needs met (food, toileting, clothing, etc.) and is not learning without one-on-one assistance. While recommendations have been made to improve this, there is no expectation that ▮▮▮▮ will ever fully recover from PTSD.

*Dr. Huckabee again promotes the argument that* ▮▮▮▮ *symptoms of aggression, "hypoarousal," "dissociation" and underactivity will require him to require long term residential care.* ==*However, I hope in this report I have provided compelling arguments against both the existence of some of these symptoms (e.g., "hypoarousal") and against their basis in PTSD.*== *The unfortunate fact is that this child has been severely disabled from birth, remains severely disabled, and will very likely remain so for the rest of his life. In many cases these individuals continue to live with their family and, alternatively,*

*they move to a sheltered setting. We all hope that ████ continues to improve his behavior so as to get as much out of life as possible.*

**CONCLUSIONS**

In my professional opinion Dr. Huckabee's hypotheses relating to ████ behavior and future progress are unsubstantiated and without merit. While Dr. Huckabee manages to fit most of ████ issues into a theory of abuse and subsequent PTSD, I propose that alternative and more parsimonious interpretations exist. Here is a child who has had ASD symptomology and intellectual disability from birth and as such, prognostic indicators unfortunately were not in his favor. He received no therapeutic intervention until he was over 4.5 years old. His placement in the San Vicente Elementary School was associated with some skill acquisition but proved to be an unfortunate mistake in terms of the alleged abuse by Mr. Notheis. Subsequently he attended a less intensive classroom at Gabilan Elementary School, which did not provide the level of structure and supports he required. Consequently, a number of behavioral issues, including aggression, became evident and after a few months he was transferred to Rose Ferrero Elementary where a more intensive and supportive classroom environment was associated with improvements in ████ behavior and an increase in academic and language. Both school personnel and ████ parents were happy with this placement.

I am of the opinion that while ████ was exposed to an unfortunate initial school placement after leaving San Vicente Elementary School, any effects of that environment were not enough to cause the later increases in behavioral issues. The fact that he improved once placed in a classroom more appropriate to his needs suggests that the effects of the alleged trauma were not permanent. If he was so badly affected by trauma, we should not expect to see improvement in such a short time (2-3 months).

Since Dr. Huckabee relies so heavily on a theory of PTSD to explain ████ behavior, it is important to provide objective and compelling reasons why PTSD is not appropriate in this case. As noted above, the overlap between PTSD and ASD symptomology is significant. I have provided above alternative interpretations of behaviors Dr. Huckabee attributes to PTSD. Further, the PTSD assessments Dr. Huckabee uses to support her hypothesis are wholly inadequate and inappropriate for a child with a diagnosis of Intellectual Disability and ASD.

It is my opinion that most of Dr. Huckabee's recommendations for future evaluation and treatment involve good practice that would be available to this child as part of his educational program and setting, or provided by the Regional Center. Most importantly, I do not see any increased need for these services based upon a diagnosis of PTSD nor exposure to alleged abuse. These services would be necessary based upon ████ diagnoses of ASD and severe intellectual disability. Also, some of the recommended services, such as a 2:1 staff ratio, are likely not necessary and this need is not supported by the data.

In sum, here we have an unfortunate situation of a severely disabled child who has certainly experienced a less-than-optimal educational history. However, I do not believe this history was responsible for the fact that ████ will need lifelong support. Absent any alleged abuse or trauma, the need for this support would have been the same.

ADDENDUM

For the preparation of this rebuttal report, I consulted with Richard J. Shaw, M.D., a child psychiatrist, and Pamela Mills, Ed.D., Ph.D. an educational specialist. Given the nature of the issues and recommendations brought up in the Huckabee report, I felt it prudent to ensure that my opinions and conclusions would be confirmed by relevant experts in certain areas. These individuals also provided input relating to the clarity and organization of my written report.

Specifically, I particularly sought Dr. Shaw's opinions regarding psychiatric consultation as recommended by Dr. Huckabee. I am not a child psychiatrist and wanted to ensure my opinions represented best and accepted practices for psychiatric consultation including the nature of the evaluation, symptoms requiring additional evaluation, and the typical schedule of evaluations for children with ASD. Dr. Shaw provided helpful input here. I also consulted Dr. Shaw regarding incidence of aggression in children with ASD to make sure my opinions were consistent with his. Dr. Shaw provided me with a research article by Kanne and Mazurek which I reviewed and found consistent with my knowledge in the area. Dr. Shaw provided me with the UCLA PTSD Reaction Index forms for children and adolescents, which I reviewed. These forms were consistent with my knowledge and opinions. Dr. Shaw also confirmed my opinions regarding PTSD and its relation to ASD.

I consulted with Dr. Mills regarding services provided by school districts and how these related to the recommendations of Dr. Huckabee. Dr. Mills also provided input regarding intellectual and behavioral assessments and her input was consistent with my opinions.

Thus, I consulted with Dr. Shaw and Dr. Mills to see if their views corroborated my opinions relating to relevant psychiatric (Shaw) and educational (Mills) issues. I did not otherwise rely in any way on Dr. Shaw's or Dr. Mills' input in formulating my conclusions or opinions. Their input confirmed and provided detail to strengthen and support my own conclusions and opinions.

Laura Schreibman, Ph.D.

Licensed Psychologist, CA PSY #5132